# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF INDIANA
## HAMMOND DIVISION AT LAFAYETTE

| | |
|---|---|
| **CYNTHIA S. HALL** | ) |
| | ) |
| **Plaintiff,** | ) |
| | ) |
| **v.** | )    **CIVIL NO. 4:07-cv-34-AS-APR** |
| | ) |
| **MICHAEL J. ASTRUE,** | ) |
| **COMMISSIONER OF SOCIAL** | ) |
| **SECURITY,** | ) |
| | ) |
| **Defendant.** | ) |

## MEMORANDUM OPINION AND ORDER

Plaintiff, Cynthia S. Hall ("Ms. Hall") seeks judicial review of the denial of benefits under Title II of the Social Security Act. The Commissioner of Social Security found that Ms. Hall was not disabled and not entitled to Disability Insurance Benefits ("DIB") under 42 U.S.C. §§ 416(I), 423.

Ms. Hall applied for DIB on August 15, 2001, claiming a disability onset date of January 31, 1995, due to back impairment, depression, bipolar disorder, sleep apnea, fibromyalgia, endometriosis, and irritable bowel syndrome. Ms. Hall's insured status, for purposes of eligibility for DIB, expired on December 31, 2000. Her initial claim and request for reconsideration were denied. Ms. Hall then requested a hearing in front of an Administrative Law Judge, which was conducted by Paul Armstrong on June 2, 2003.[1] Administrative Law Judge Armstrong issued an opinion dated June 18, 2003, denying her application for benefits. Ms. Hall filed a request for review, and the Appeals Council remanded the case on January 12,

---

[1] The Court takes judicial notice of the June 2, 2003 administrative hearing in which Ms. Hall appeared by counsel, and testified along with William Hall, medical expert James M. Brooks, and vocational expert Gail Ditmore. Tr. 540-604.

2004 to evaluate the limitations given by Dr. Gutierrez. A hearing was held on October 7, 2005 by Administrative Law Judge Manuel Carde, ("the ALJ") who decided that a consultative psychological examination needed to be obtained.[2] The psychological examination was obtained and proffered to counsel for submission of written comments or additional evidence. Counsel did not request any additional administrative proceedings. By a decision dated January 23, 2007, ALJ Carde denied Ms. Hall benefits, finding that Ms. Hall was not disabled because she could perform jobs existing in significant numbers in the national economy. The Appeals Council denied review, making the ALJ's January 23, 2007 decision the final decision of the Commissioner. Ms. Hall filed her complaint on June 25, 2007, contending that the January 23, 2007 decision by ALJ Carde is not supported by substantial evidence and is contrary to law. Jurisdiction is conferred upon this Court pursuant to 42 U.S.C. § 405(g), and a hearing was held on June 25, 2008 in Lafayette, Indiana.

## FACTUAL BACKGROUND

Ms. Hall was thirty-seven years old on the date she was last insured, and is therefore considered a "younger person." *See* 20 C.F.R. § 404.1563(c). She is a high school graduate. Prior to her disability, Ms. Hall worked as a medical records clerk, receptionist, factory assembler lifting sides of semis, ward clerk, and a nursing assistant; but, as the ALJ concluded and the parties agree, Ms. Hall had not engaged in substantial gainful activity during the time frame from her alleged onset date of disability through the expiration of her insured status.

Ms. Hall's medical problems before her disability onset date of January 31, 1995, reveal that in late 1991 Ms. Hall under went physical therapy for lumbar strain, and on December 16,

---

[2]The Court takes judicial notice of the October 7, 2005 administrative hearing in which Ms. Hall appeared by counsel and testified. Tr. 614-625.

1991 an MRI of Ms. Hall's lumbar spine revealed disc protrusion at L5-S1 and disc bulge at L4-5. In March and November 1992, Ms. Hall under went physical therapy for severe back pain and was trained to use the TENS unit.

On January 27, 1995, four days prior to her alleged disability, Ms. Hall had an epidural steroid injection at the L4-5 interspace. An MRI scan from February 24, 1995, showed herniated disks at L4-5 and L5-S1, both just left of the midline. Dr. Cooper, a neurosurgeon, reviewed the MRI scan on March 10, 1995 and noted that it showed no great deal of change since 1991 with conservative treatment, therefore surgery was planned. As a result, later that month Ms. Hall underwent a microdiskectomy with removal of the extruded disc on the left, L5-S1. While Ms. Hall experienced improvement for the first couple months, her pain returned. On September 22, 1995, an MRI of Ms. Hall's lumbar spine showed L4-5 degenerative disc disease, a herniated disc abutting the expected course of the L5 nerve root, and post-surgical changes at the L5-S1 level. Then on December 11, 1995, Ms. Hall received a lumbar nerve block injection.

The years 1996 and 1997 revealed few documented medical problems. Dr. Hatvani, M.D., saw Ms. Hall at the request of Dr. Cooper on January 9, 1996, and documented Ms. Hall's slow, careful gait, difficulty bending, positive straight leg raise test, and decreased sensation in her left leg. Dr. Hatvani reported an impression of chronic low back pain and post discectomy at L5-S1 level with post surgical myofascial involvement, and recommended the addition of myofascial treatment to her physical therapy regimen. On November 26, 1997, Dr. Gutierrez saw Ms. Hall for abdominal pain which was consistent with acute left pyelonephritis.

Notably, on January 17-20, 1998, Ms. Hall was hospitalized with acute vascular headache, a new onset of hypertension, and documented osteoarthritis of the lumbar spine and acute sinusitis. An examination revealed that Ms. Hall had no neurological abnormalities, and a

CT scan of her spine was normal. In September, Ms. Hall complained of a two-month history of low back and bilateral leg pain. Bonnie Neff, a nurse, documented Ms. Hall's reduced lumbar range of motion, symmetrical reflexes, 5/5 muscle strength, and some decreased sensibility to painful stimuli in her calves but otherwise normal sensation. Ms. Neff consulted with Dr. Cooper, and recommended treatment with a tapering dose of steroids. On September 3, 1998, an MRI of Ms. Hall's lumbar spine showed mild central disk herniation at L4-5 compressing the cord causing canal stenosis, with no neural foraminal or recess stenosis, mild epidural scarring at L5-S1, and mild L5-S1 interspace narrowing. On September 21, 1998, Dr. Cooper did a lumbar steroid epidural injection, and in November and December Ms. Hall was treated with physical therapy for chronic low back pain.

On April 16, 1999, Dr. Cooper's nurse practitioner Stacy Bell saw Ms. Hall who complained of pain in her lower back, buttocks, and thighs; she stated that her symptoms began approximately one month prior and gradually worsened. Ms. Hall was cooperative, did not appear depressed or anxious, and physically she had decreased sensation, normal reflexes, no spasm, positive straight leg raise, and full range of motion of her hips, knees, and back. Dr. Cooper ordered an MRI study which showed no recurrent herniated disk and the findings were not overly impressive. In April and May, Ms. Hall participated in a physical therapy program, reporting at the initial evaluation that she was a very active housewife with four children under sixteen years old, yet she was having difficulty performing household chores and sleeping at night. Then on June 7, 1999, Ms. Hall had a lumbar myelogram that showed small extradural defects from L2-3 through L5-S1 disc levels, with the L4-5 level being the most prominent. A CT scan of the lumbar spine revealed a small central and left paramedian disc herniation. On June 22, Dr. Cooper performed a microdiskectomy of L4-5, left. Later that year, on November

9, 1999, Dr. Gutierrez saw Ms. Hall for urinary tract infection and back/pelvic pain, and Dr. Gutierrez noted that Ms. Hall looked somewhat depressed.

On January 31, 2000, Dr. Gutierrez saw Ms. Hall due to her complaints of weight gain, irritability, fatigue, poor sleep, generalized pain, insomnia, and hot flashes. Dr. Gutierrez noted that Ms. Hall appeared depressed, and the results of a depression test suggested severe depression. Ms. Hall's musculoskeletal examination was normal. Shortly thereafter, on February 7, 2000, an examination of Ms. Hall by Dr. Gutierrez showed she was very depressed with flattened affect and he diagnosed her with chronic fatigue of an undetermined cause and severe depression. Dr. Gutierrez increased Ms. Hall's dosage of antidepressant medication, prescribed a nonsteroidal anti-inflammatory medication, and gave her literature on depression. On March 3, 2000, Dr. Gutierrez's examination of Ms. Hall disclosed multiple trigger points, and at this point he thought that Ms. Hall suffered from fibromyalgia syndrome. Again, he noted her as having severe depression with a history of physical and sexual abuse in childhood. Dr. Gutierrez renewed Ms. Hall's prescriptions and made referrals for a sleep study and a rheumatology consultation with Dr. Michael Lockwood.

Dr. Lockwood saw Ms. Hall on March 27, 2000, and diagnosed fibromyalgia with characteristic tender points, fatigue, sleep disorder, depression and irritable bowel syndrome. On May 22, his impression again was that Ms. Hall had fibromyalgia and overwhelming depression associated with it, and he started her on the TENS unit.

On June 6, 2000, a sleep study was conducted on Ms. Hall, and revealed that she had fairly poor sleep quality, and a nasal mask was recommended. Later that month, on June 20, Dr. Gutierrez diagnosed Ms. Hall with severe fibromyalgia, and dysthymia with a history of physical abuse. Ms. Hall was referred to Dr. Nizar El-Khalili for a psychiatric evaluation. Also in June

through August 2000, Ms. Hall engaged in a physical therapy program and reported that her activities consisted of running around with her kids all day and doing housework, but that she also sat too many hours in a day.

On July 2, 2000, an initial psychiatric assessment of Ms. Hall was conducted by Dr. El-Khalili.  Ms. Hall complained of a depressed mood, crying spells, suicidal thinking with no intent or plan, an inability to sleep, and excessive appetite; she reported that she had experienced periods of mania in the past.  Dr. El-Khalili noted that Ms. Hall was cooperative and somewhat anxious during the interview, and diagnosed her with bipolar disorder, depressed without psychotic features, and assigned her a Global Assessment of Functioning ("GAF") score of 55, indicating moderate symptoms (e.g. flat affect and circumstantial speech, occasional panic attacks) or moderate difficulty in social, occupational or school functioning (e.g. few friends, conflicts with peers or co-workers).  Dr. El-Khalili prescribed her medications, and saw Ms. Hall twice in August 2000 for follow-up visits, and adjusted her medications.

Ms. Hall was admitted to the hospital on July 19 to July 22, 2000 with excruciating back pain, yet acknowledged that she had previously been doing fine.  Dr. Gutierrez admitted Ms. Hall with a diagnosis of advanced degenerative joint disease of the spine with acute exacerbation of pain, and radiculitis (versus radiculopathy) of the lumbar spine. An examination of Ms. Hall showed moderate to severe central tenderness at the L4-5 level, and the flexion of the spine was less than 30 degrees.  A CT scan revealed diffuse disc bulges at the L3-4 and L4-S1 levels, while an EMG study was negative.  Ms. Hall's discharge diagnoses were moderate to severe DJD of the spine, L3-4 disc herniation with spinal stenosis, severe low back pain, fibromyalgia, bipolar disorder, and sleep apnea, and she was treated with medications and physical therapy.

On August 14, 2000, Dr. Lockwood saw Ms. Hall for her fibromyalgia. He documented that she was on a very aggressive regimen from Dr. Gutierrez and Dr. El-Khalili with respect to her medications, and he continued to advocate that she engage in cardiovascular exercise, especially water exercise. In November of 2000, Ms. Hall experienced increased back pain, and an MRI study showed a markedly extruded disk on the left side which Dr. Cooper felt was a possible disc recurrence. Dr. Cooper also documented Ms. Hall's satisfactory back range of motion, positive straight leg raise test, hypoactive reflexes, and spotty hypalgesia.

The record also contains documentation of Ms. Hall's medical condition in the year 2001, even though Ms. Hall was last insured as of December 31, 2000. On January 2, 2001, Dr. Gutierrez saw Ms. Hall for advanced DJD of the spine, and acute low back pain which seemed to be secondary to muscle contracture. Dr. Gutierrez noted that Ms. Hall returned to his office with one of her typical flair-ups of low back pain which started 3 or 4 days prior to the visit. The following day, January 3, Ms. Hall was admitted to the hospital for three days, but confirmed that she had been feeling "really well" prior to this incident. She was treated with medications and physical therapy. Ms. Hall was discharged on January 6, with a diagnosis of chronic low back pain, moderate to severe DJD of the spine, bipolar disorder, fibrocystic breast disease, fibromyalgia, and sleep apnea. Ms. Hall seemed depressed and a psychiatric consultant recommended that she seek outpatient psychotherapy, and Ms. Hall was prescribed OxyContin increased to 40 mg daily.

On January 18, 2001, Dr. Cooper performed a microdiskectomy with removal of the extruded inferior displaced fragment. When Dr. Cooper followed-up with her one month later, she was having more pain than he expected. Dr. Cooper documented Ms. Hall's positive straight

leg raise test, satisfactory hip motion, symmetrical reflexes, and unchanged sensation, and placed her on Elavil and advised her to start physical therapy.

Dr. Gutierrez saw Ms. Hall later that year, on May 29, for uncontrolled fibromyalgia, chronic depression, chronic insomnia, and chronic fatigue. He encouraged her to continue counseling at Wabash Valley Hospital Outpatient Clinic. On June 16, 2001, Dr. Gutierrez saw Ms. Hall who complained of aching throughout her body, fatigue, malaise, and weakness in her legs. Dr. Gutierrez noted that she appeared depressed with flat affect, noted her normal strength in her legs and satisfactory discrimination to stimuli in her legs. Ms. Hall returned to physical therapy with a diagnosis of fibromyalgia and low back pain. Dr. Gutierrez saw Ms. Hall again on July 13, 2001, for uncontrolled sleep apnea, uncontrolled dysthymia, chronic insomnia, and uncontrolled fibromyalgia. Dr. Gutierrez referred her to Dr. Hoyer.

On July 27, 2001, a mental health status report showed that Ms. Hall complained of mood swings, crying spells, chronic pain for years, a horrible childhood, possible flashbacks, back pain into both legs, headaches, chronic fatigue, and insomnia, and it was documented that she spent the last two months worrying about medical problems. Dr. Boniello, a clinical psychologist, counseled Ms. Hall five times through December 2001, documenting several cancelled appointments and noting that her complaints largely involved family issues.

On September 4, 2001, Dr. Cooper saw Ms. Hall and she reported that following her surgery she did reasonably well until July 2001, when her symptoms significantly increased. Dr. Cooper's treatment notes document that her straight leg raising was positive on both sides. He also noted that her MRI showed an abnormality at L5-S1 which was not present before, and may have been a synovial cyst being read out as a bone spur.

On October 16, 2001, Ms. Hall saw Dr. Scott Hoyer due to insomnia. Ms. Hall described her very active typical day, including getting her children ready for school, completing housework, washing the laundry, cooking, emailing, helping her children with homework, except on bad days when she generally just laid down on the couch. Dr. Hoyer documented her normal gait, no neurological deficits, appropriate mood, and normal mentation. Dr. Hoyer's assessment of Ms. Hall was migraine headaches, tension type headache disorder, fibromyalgia, chronic low back pain status post lumbar discectomy on 3 occasions, and resultant leg pain causing significant daytime dysfunction, as well as, associated sleep disorder and mood disorder including bipolar disorder and depression by history. Dr. Hoyer prescribed her medication and recommended that she exercise and walk a quarter to one-half mile a day.

Dr. Gutierrez saw Ms. Hall on October 24, 2001, for acute thoracic spine pain, and again on November 19, 2001, for atypical chest pain (resulting in a false positive CKMB test), musculoskeletal chest pain, fibromyalgia uncontrolled, and myofascial thoracic pain syndrome. On November 30, 2001, an exercise stress test was abnormal which was consistent with anterior ischemia, and a chest x-ray showed interval improvement with resolution of patchy interstitial opacities in her lung bases. On December 21, 2001, Ms. Hall's heart catheterization showed non-obstructive coronary disease, proximal RCA eccentric lesion that was more likely causing spasm, with a normal LVEF.

In May 2003, Dr. Gutierrez was asked to comment on Ms. Hall's limitations for the year 2000. Dr. Gutierrez concluded that Ms. Hall had limitations that proved inconsistent with the ability to perform a full range of sedentary work. Specifically, his opinion revealed the following:

a. Diagnosis is fibromyalgia by Dr. Lockwood in November 2000; advanced DJD of lumbar spine, chronic low back pain, sleep apnea.

b. Ms. Hall can stand for 10-15 minutes at one time. She can stand for 25-35% pf the work day. Reason is low back pain, leg pain/weakness/numbness/loss of balance. Ms. Hall can walk for 20 minutes without stopping for a rest. She can walk 25% of the work day. She can stand and/or walk in combination 25-30% of the work day. Reason is osteoarthritis of spine and leg weakness. Ms. Hall can sit for 15-30 minutes at one time. She needs 30 minute break before she can sit that long again. She can sit for 25% of the work day.

c. Ms. Hall can lift or carry 5-7 pounds. She can carry 2-3 pounds every 10 minutes. Ms. Hall can lift no weight from near the floor to waist high. She can lift or carry up to 10 pounds for 5% of a work day, and 20 pounds for zero percent of a work day.

d. Ms. Hall is unable to reach above shoulder level which generates low back pain. Ms. Hall can push or pull arm controls occasional, patient is limited by low back pain. Reason for above is low back pain when arm use requires strenuous activities. Ms. Hall can use foot controls once every zero minutes due to leg weakness and weakness caused by osteoarthritis of the spine causing spinal stenosis.

e. Ms. Hall cannot bend at the waist once, cannot squat by bending knees once. Ms. Hall can climb a flight of stairs once an hour. She cannot climb on ladders. Medical reason is the same as stated above.

f. Ms. Hall need avoid dust, fumes or gases no more than most people. Significant changes in temperature or humidity should not affect her any more than most people.

g. Ms. Hall would be expected to miss more than one day a month or to leave work before the end of her shift because of having advance degenerative disc disease of lumbar spine associated with spinal stenosis with bilateral leg weakness/numbness.

h. Ms. Hall has side effects of medications or treatment which limit bending, repetitive movements, pushing, bending, pulling, rotating for the reasons given above.

In June 2003, Dr. James Brooks, a psychologist, completed a psychiatric review assessing Ms. Hall's residual functional capacity ("RFC") and impairments covering the time period from January 21, 1995 to December 31, 2000, at the request of the state agency. Dr.

Brooks noted that Ms. Hall met Listing 12.04 for affective disorders, including depression and potentially bipolar disorder. Dr. Brooks's rated Ms. Hall's functional limitations and noted that she engages in some exercise, watches television, cares for the children, does light chores, and works on the computer. He also reported that Ms. Hall had mild to moderate restrictions in her activities of daily living (mainly restricted by repeated pain), mild to moderate difficulties in maintaining social functioning (also mainly restricted by repeated pain), and mild difficulties in maintaining concentration, persistence or pace (with no cognitive impairment noted). Dr. Brooks found that there were no episodes of decompensation, and no evidence to establish the presence of "C" criteria of Listing 12.04. Dr. Brooks also completed a statement indicating that Ms. Hall's ability to do work-related mental activities was "good," that her impairment did not affect her ability to understand, remember, or carry out instructions, and that her impairment did not affect her ability to respond appropriately to supervision, co-workers, and work pressures in a work setting.

In October 2004, Dr. Gutierrez advised Ms. Hall to exercise routinely and find a part-time job which, he felt, would be "awesome therapy" for her.

At the request of the ALJ, John Heroldt, a licensed psychologist, performed a consultative examination in November 2005. Ms. Hall complained of bipolar disorder. Dr. Heroldt commented that Ms. Hall presented with a flat affect and had below average memory, but she had no difficulty performing simple arithmetic calculations, and she displayed no evidence of psychotic symptoms. Dr. Heroldt diagnosed Ms. Hall with bipolar I disorder and a borderline personality disorder, and concluded that Ms. Hall was not capable of handling her funds. Dr. Heroldt found that Ms. Hall had an "average" ability to perform simple, repetitive tasks, "average" ability to respond appropriately to supervision, and a "poor" ability to tolerate

normal work activities, work in settings free of unusual stress, tolerate contacts with the general public or coworkers, and structure a daily routine for herself.

## STANDARD OF REVIEW

This Court's review of the Commissioner's decision is a limited one. Unless there is an error of law, the court will uphold the Commissioner's findings of fact if they are supported by substantial evidence. *Schoenfeld v. Apfel*, 237 F.3d 788, 792 (7th Cir. 2001). Substantial evidence consists of "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971). In making a substantial evidence determination, the court will review the record as a whole, but will not reconsider the facts, reweigh the evidence, or substitute its own judgment for that of the Commissioner. *William v. Apfel*, 179 F.3d 1066, 1071-72 (7th Cir. 1999). That being said, the ALJ must "build an accurate and logical bridge between the evidence and the result." *Shramek v. Apfel*, 226 F.3d 809, 811 (7th Cir. 2000). Thus, if reasonable minds could disagree on whether an individual is disabled, the court must affirm the Commissioner's decision denying benefits. *Schmidt v. Apfel*, 201 F.3d 970, 972 (7th Cir. 2000); *Books v. Chater*, 91 F.3d 972, 978 (7th Cir. 1996). However, the district court is required to critically review the evidence and not simply rubber-stamp the Commissioner's decision. *Clifford v. Apfel*, 227 F.3d 863, 869 (7th Cir. 2000).

## DISCUSSION

Generally, "[b]enefits are available only to those individuals who can establish disability under the terms of the Social Security Act." *Estok v. Apfel*, 152 F.3d 636, 638 (7th Cir. 1998). Specifically, the claimant bears the burden of showing through testimony and medical evidence supported by clinical data and laboratory diagnosis that she was disabled during the period in which she was insured. *Reading v. Matthews*, 542 F.2d 993, 997 (7th Cir. 1976) (citing *Jeralds*

*v. Richardson*, 445 F.2d 36 (7th Cir. 1971)). Furthermore, the claimant must show that she is "unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A).

The regulations supporting the Social Security Act create a five-step inquiry in determining whether a claimant is disabled, under which the ALJ must consider the applicant's claim in the following sequence:

1. Whether the claimant is currently employed;
2. Wether the claimant has a severe impairment;
3. Whether the claimant's impairment meets or equals one listed by the Secretary;
4. Whether the claimant can perform her past work; and
5. Whether the claimant is capable of performing any work in the national economy.

*See Dixon v. Massanari*, 270 F.3d 1171, 1176 (7th Cir. 2001) (citing 20 C.F.R. § 404.1520). The initial burden in steps one through four is on the plaintiff; only at step five does the burden shift to the Commissioner. *Bolinger v. Barnhart*, 446 F.Supp.2d 950, 955 (N.D.Ind. 2006).

In this case, the ALJ concluded at step one of the five-step disability determination, that Ms. Hall had not engaged in substantial gainful activity since the alleged onset date of her disability, January 31, 1995, through her date last insured of December 31, 2000. At step two the ALJ concluded that Ms. Hall had a severe impairment as a result of degenerative disc disease of the lumbar spine, fibromyalgia, sleep apnea, and depression. At step three the ALJ determined that through the date last insured, Ms. Hall did not have an impairment or combination of impairments which met or medically equaled an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1 ("Listing(s)"). The ALJ declared that Ms. Hall retained an RFC

to perform unskilled sedentary work, but that for purposes of step four, Ms. Hall was not able to perform her past relevant work. Finally, at step five, the ALJ determined that considering Ms. Hall's age, education, work experience, and RFC, there were a significant number of jobs that she could have performed in the national economy. Therefore, the ALJ concluded that Ms. Hall was not under a disability as defined by the Act at any time from January 31, 1995 through December 31, 2000.

As follows, Ms. Hall raises five issues for this Court's review: (1) the ALJ improperly relied on the Medical-Vocational Rules without taking into account non-exertional limitations that the ALJ gave; (2) the ALJ failed to recognize that the twelve month period of disability can include time after the last date Ms. Hall was insured, so long as the disability started while she was insured; (3) the ALJ gave too little weight to the opinion of the treating physician, Dr. Gutierrez, merely because Dr. Gutierrez relied heavily on Ms. Hall's subjective report of symptoms and limitations from fibromyalgia; (4) the ALJ gave too great of weight to the state agency physicians' opinions who did not have the benefit of reviewing Ms. Hall's exhibits; and (5) although the ALJ required a consultative examination, he erred by not mentioning the results of the examination in his decision. Ms. Hall requests that the Court reverse the decision of the ALJ and award benefits, or in the alternative, remand the case to the Defendant for a fair hearing.

**(1)     Reliance on the Medical-Vocational Rules**

Ms. Hall contends that the ALJ erred by strictly applying the Medical Vocational Rules (instead of using them as guidelines) when Ms. Hall's severe mental impairment of depression affected her ability to work. In essence, because the ALJ determined that Ms. Hall's depression was severe, yet she had the residual functional capacity to perform sedentary work and was not

disabled based upon Medical Vocational Rule 201.28, Ms. Hall argues that the ALJ failed to limit the range of sedentary jobs that she could perform to include only those jobs that did not involve more than simple instructions.

This Court does not agree. The ALJ determined that there was no period of a least twelve consecutive months that Ms. Hall could not lift or carry ten pounds occasionally, stand or walk two hours of an eight hour workday or sit six hours, and that she was able to understand, remember and carry out simple instructions; respond appropriately to supervision, coworkers and usual work situations; and, deal with changes in a routine work setting; and, the ALJ determined that Ms. Hall was unable to perform her past relevant work as a nurse's aid, a semi assembler, a medical records clerk and a receptionist/dark room attendant because these jobs required the ability to lift and carry at least twenty pounds and stand/walk six hours of an eight hour day. The ALJ's RFC determination was based on the medical and non-medical evidence in the record, and the finding was equated to Ms. Hall's ability to perform a full range of <u>unskilled</u> sedentary work, or work that by definition involves understanding, remembering, and carrying out simple instructions, responding appropriately to supervision, coworkers, and usual work situations, and dealing with changes in a routine work setting. *See* Social Security Ruling ("SSR") 96-9p. In other words, the ALJ did limit the range of sedentary jobs that could be performed by Ms. Hall by requiring the range of sedentary jobs to include only unskilled jobs. Thus, the non-exertional limitations imposed by the ALJ were consistent with Ms. Hall's ability to perform a full range of unskilled sedentary work, which included a significant number of jobs in the national economy during the relevant period. The ALJ properly relied on Rule 201.28 of the Medical Vocational Rules because the Rule takes administrative notice of the existence of unskilled, sedentary occupations, including approximately 200 unskilled sedentary occupations

(referring to even more jobs)—many of which Ms. Hall could perform considering the limitations imposed.

In addition, the ALJ's determination that Ms. Hall was capable of performing unskilled sedentary jobs is supported by the testimony provided by the vocational expert, Gail Ditmore, at the June 2, 2003 administrative hearing. Ms. Ditmore considered a hypothetical individual who was restricted to performing sedentary work that involved no more than superficial contact with supervisors, coworkers, and the general public, and concluded that a person with such limitations and with Ms. Hall's vocational profile could perform a significant number of unskilled jobs including an assembler (of smaller pieces), an inspector, and an information clerk (assuming that dealing with the public by phone is considered superficial contact). In reviewing the record in its entirety, the Court finds that the ALJ's determination at Step Five is supported by substantial reliable evidence that would persuade a reasonable person that the limitations in question do not significantly diminish the employment opportunities otherwise available to Ms. Hall.

**(2)**     **Period of Disability After Date Last Insured**

The ALJ found that there was no consecutive twelve month period prior to December 31, 2000 that Ms. Hall could not have performed a significant number of jobs that existed in the national economy. Ms. Hall argues that the ALJ failed to consider whether she had a disabling back impairment prior to December 31, 2000 under 20 C.F.R. § 404.131(a), where the record shows that Ms. Hall developed severe back pain prior to Christmas 2000, had an extruded disc at L5-S1 on the left, and had a third surgery performed on January 2001.

Ms. Hall's own statements and the objective medical evidence show that Ms. Hall's back impairment, or any other impairment for that matter, was not a disabling impairment that lasted for at least twelve consecutive months. Ms. Hall reported running around with her kids all day

and doing housework, along with sitting many hours, as late as June and August 2000. Indeed, after reporting feeling "really well" just prior to December 2000, she then experienced a flair-up involving intolerable back pain until early 2001. Dr. Cooper performed surgery on January 18, 2001, and Ms. Hall experienced improvement to the point that she was doing "reasonably well" until July 2001. The medical records also indicted that in May of 2001, Dr. Gutierrez noted her complaints from fibromyalgia, depression, insomnia, and fatigue. Further, June and July 2001 reveal that Ms. Hall's examinations show she had normal/good leg strength, symmetrical reflexes, and satisfactory discrimination to stimuli in both legs. Later that year, in October 2001, Dr. Hoyer noted Ms. Hall's normal gait and no neurological deficits, and recommended that she exercise and walk up to one-half mile every day. In 2003, Dr. Gutierrez retrospectively concludes that Ms. Hall was not able to perform sedentary work in 2000—which is simply not supported by the records from 2000. The substantial evidence supports the ALJ's determination that Ms. Hall did not have a disabling impairment that began on or before December 31, 2000, and continued for at least twelve months thereafter.

**(3)      Weight Afforded Treating Physician's Opinion**

The ALJ determined that Ms. Hall's fibromyalgia was a "severe" impairment, yet noted that Dr. Gutierrez's muscular skeletal examination was unremarkable. Ms. Hall asserts that the ALJ failed to consider the fact that many fibromyalgia symptoms are subjective, *Sarchet v. Charter*, 78 F.3d 305, 306-07 (7th Cir. 1996), and erroneously afforded too little weight to the opinion of the treating physician, Dr. Gutierrez, simply because Dr. Gutierrez relied heavily on Ms. Hall's subjective complaints of symptoms and limitations.

First, reliance on *Sarchet* does not help Ms. Hall in this case. Unlike in *Sarchet,* here the ALJ concluded that Ms. Hall does, in fact, suffer from fibromyalgia. His reason for denying Ms.

Hall Social Security benefits stems from his conclusion that, despite the seriousness of her fibromyalgia, Ms. Hall is nonetheless able to perform a significant number of jobs in the national economy. Moreover, unlike in *Sarchet*, where the ALJ failed to understand fibromyalgia or the medical evidence present in that case, here the ALJ specifically took note that in August of 2000, Ms. Hall reported complaints of fatigue, irritability and pain, and was on an aggressive regimen of medication and physical therapy, but she admitted that she was "not doing good but not really bad." Further, the ALJ noted that while Ms. Hall alleged symptoms that severely limited her ability to perform physical activity, she continued to care for her minor children and her primary care physician/treating doctors consistently recommended regular exercise. Ms. Hall has presented no evidence that the ALJ had an unclear understanding of the disease or of her particular medical facts.

Further, the weight afforded to the opinion of the treating physician, Dr. Gutierrez, was not in error. It is true that a treating physician's opinion regarding the nature and severity of a medical condition is entitled to controlling weight if it is (1) supported by medical findings; and (2) consistent with substantial evidence in the record. *Elder v. Astrue*, 529 F.3d 408, 415 (7th Cir. 2008) (citing 20 C.F.R. § 404.1527(d)(2); *Skarbek v. Barnhart,* 390 F.3d 500, 503 (7th Cir. 2004)). However, a decision to deny a physician's opinion controlling weight does not prevent the ALJ from considering it, and the ALJ may still look to the opinion after opting to afford it less evidentiary weight. *Elder*, 529 F.3d at 415. Exactly how much weight the ALJ affords depends on a number of factors, such as the length, nature, and extent of the physician and claimant's treatment relationship, *see* 20 C.F.R. § 404.1527(d)(2)(I)-(ii), whether the physician supported his or her opinions with sufficient explanations, *see id.* § 404.1527(d)(3), and whether

the physician specializes in the medical conditions at issue, *see id.* § 404.1527(d)(5). *Elder*, 529 F.3d at 415 (citing *Hofslien v. Barnhart,* 439 F.3d 375, 377 (7th Cir. 2006)).

Here, the ALJ did not "play doctor" as claimant's counsel suggests, but acknowledged that generally greater weight is afforded to treating source opinions, but explained why this case was different and why he afforded Dr. Gutierrez's opinion less weight. The ALJ noted that Dr. Gutierrez, although Ms. Hall's primary care physician, specialized in family practice, unlike Dr. Cooper who was Ms. Hall's treating physician/surgeon for her back impairment. Nor was Dr. Gutierrez a rheumatologist. Further, the ALJ lent little weight to Dr. Gutierrez's opinion because her evaluation was not consistent with the medical evidence, including Dr. Gutierrez's own treatment notes indicating that in December of 2000 and June of 2001, Ms. Hall's musculo-skeletal examination was unremarkable and she had normal strength and sensation in both lower extremities. And, in 2003, Dr. Gutierrez explained that Ms. Hall's limitations during the year 2000 were due to osteoarthritis that resulted in low back pain and weakness/numbness in her legs, not due to her fibromyalgia. As counsel for the Commissioner noted in oral argument, what Dr. Gutierrez was treating Ms. Hall for was not the basis of his opinion.

The ALJ also noted that Ms. Hall did not have a significant restriction of function of major joints, and that Dr. Gutierrez relied heavily on Ms. Hall's subjective report of symptoms and limitations which the ALJ determined were not fully credible based on the record evidence showing that Ms. Hall's impairments caused more than a minimal adverse impact upon her ability to perform some basic work-related activities, but failed to establish that they rose to a disabling level of severity. The ALJ's decision is supported by the substantial evidence in this respect. *See Dixon v. Massanari*, 270 F.3d 1171, 1178 (7th Cir. 2001) ("An ALJ may properly reject a doctor's opinion if it appears to be based on a claimant's exaggerated subjective

allegations.").  In fact, Dr. Gutierrez did not place limitations on Ms. Hall's ability to work on or before December 2000.  Here, the trier of fact, the ALJ, properly articulated his reasons for declining to afford substantial weight to the opinion of Dr. Gutierrez, *see Elder v. Astrue,* 529 F.3d 408, 416 (7th Cir. 2008), and the Court sees no fault in his determination.

**(4)**      **Weight Afforded State Agency Physicians' Opinions**

Ms. Hall contends that the state agency physicians did not review all the record evidence in reaching their conclusions, including, but not limited to: (a) Dr. Gutierrez's reported history and physical of Ms. Hall on July 19, 2000 showing Ms. Hall's advanced DJD of the spine, L3-4 disc  herniation, severe back pain, bipolar disorder, fibromyalgia, and sleep apnea; (b) the June 21, 2000 sleep study showing that Ms. Hall had alpha intrusion; (c) Ms. Hall's documented use of the TENS unit and physical therapy evaluation of April 22, 1999 and notes from November of 1998; and (d) Dr. Gutierrez's progress notes for 2000 and 2001.

As claimant's counsel fails to attempt to explain how this evidence might have affected the outcome of the state agency physicians' opinions, or explain how this evidence would impose greater limitations on Ms. Hall than those reflected in the ALJ's RFC finding for unskilled sedentary work, the Court is left to guesswork.  After review of the records, the Court finds that some of the records address the period after the date Ms. Hall was last insured and fail to show a disability which began prior to the expiration of her insured status and continued for twelve months thereafter.[3]  The remaining records are repetitive or fail to indicate that the ALJ's RFC finding was erroneous.  More importantly, the ALJ reviewed and considered the evidence

---

[3]If Ms. Hall has developed additional impairments, or her impairments have worsened, since her first application for benefits, she is not prevented from submitting a new application. *See Getch v. Astrue*, 2008 WL 3403463 *8 (7th Cir. Aug. 13, 2008).

identified by Ms. Hall, and the ALJ was entitled to decide which doctors to believe based on the information reviewed by those doctors, their expertise, and any potential bias. *See Micus v. Bowen*, 979 F.2d 602, 608 (7th Cir. 1992). As such, the ALJ was entitled to rely on the opinions of the state agency reviewing doctors, and consider their opinions in light of their familiarity with the record and the disability program requirements. This Court is convinced that the ALJ's decision is supported by substantial evidence.

**(5)** **Psychological Consultative Examination**

At the request of the ALJ, Ms. Hall was seen by Dr. Heroldt for a consultative mental status examination and a clinical interview on November 9, 2005. Dr. Heroldt diagnosed Ms. Hall with bipolar disorder, depression severe and chronic, and borderline personality disorder, and assigned her a GAF of 45. Dr. Heroldt also completed a work-related activity assessment and found that Ms. Hall had an average ability to perform simple repetitive tasks and to respond appropriately to supervision, yet, she had a poor ability to tolerate normal work activities, to work in a setting free of unusual stress, to tolerate contacts with the general public or coworkers, and to structure herself to a daily routine. Ms. Hall argues that the ALJ erred by not mentioning the results of the evaluation and the assertions made by Ms. Hall's counsel which allegedly show the need for Ms. Hall's RFC to have more mental limitations than assigned by the ALJ.

Although the ALJ did not mention Dr. Heroldt's opinion, this does not require the Court to set aside the ALJ's denial of benefits. *See Zurawski v. Halter,* 245 F.3d 881, 889 (7th Cir. 2001) (reasoning that an ALJ is not required to address every piece of evidence or testimony in the record, but the ALJ's analysis must provide some glimpse into the reasoning behind the decision to deny benefits). Dr. Heroldt's consultative examination was performed almost five years after the relevant time period, and he did not offer a retrospective opinion. The ALJ did

not error in failing to discuss an examination which was not relevant for purposes of determining whether Ms. Hall had a disabling impairment on or before December 31, 2000.

Moreover, the ALJ properly assessed Ms. Hall's depression/mental impairment under the technique set forth in 20 C.F.R. § 404.1520a. *See Craft v. Astrue*, 2008 WL 3877299 *4 (7th Cir. Aug. 22, 2008). The ALJ found that in 2000 Ms. Hall was diagnosed with bipolar disorder, depressed without psychotic features and was assigned a GAF score of 55. Then the ALJ stated that he saw little indication that Ms. Hall's mental impairment affected her ability to perform daily activities or to structure a daily routine for herself. The ALJ also noted that Ms. Hall suffered only moderate limitations in maintaining social functioning, and mild difficulties in maintaining concentration, persistence, and pace, and no episodes of decompensation, nor did the record establish an inability to function outside a highly supportive living arrangement. The ALJ determined that Ms. Hall's depression was severe, yet the impairment or combination of impairments did not meet or medically equal one of the listed impairments, and then determined her RFC. Furthermore, similar to the vocational expert's assessment of Ms. Hall, the ALJ determined that in light of her age, education, work experience, and residual functional capacity, Ms. Hall was not disabled because she could perform a significant number of jobs in the economy. ALJ Carde discussed the evidence favoring Ms. Hall's position, as well as the evidence supporting the denial of benefits, and built an accurate and logical bridge from the evidence to the decision to deny Ms. Hall benefits.

Accordingly, the ALJ's finding that Ms. Hall was not disabled as defined by the Social Security Act is supported by such relevant evidence as a reasonable mind might accept as adequate to support his conclusion, and the Court will not disturb the ALJ's decision.

**CONCLUSION**

The purpose of this Court's review of the ALJ's decision is only to ensure that it is supported by substantial evidence. Therefore, given that the ALJ's decision was supported by substantial evidence, the decision of the Commissioner is **AFFIRMED.**

**SO ORDERED**.

**DATED: September 12, 2008**

_____/s/ ALLEN SHARP_____
**ALLEN SHARP, JUDGE**
**UNITED STATES DISTRICT COURT**